[Cite as *State v. Wallace*, 2019-Ohio-442.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

STATE OF OHIO,                                                       :

     Appellee,                                               :

- vs -

WILLIAM WALLACE, JR.,                                     :

     Appellant.                                             :

CASE NOS.  CA2017-09-011
CA2017-11-014

O P I N I O N
2/11/2019

CRIMINAL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. CRI2016-2065

Zachary A. Corbin, Brown County Prosecuting Attorney, 510 East State Street, Suite 2, Georgetown, Ohio 45121, for appellee

Craig M. Jaquith, Assistant State Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215, for appellant

**HENDRICKSON, J.**

{¶ 1} Appellant, William Wallace, Jr., appeals from his convictions in the Brown County Court of Common Pleas for rape, unlawful sexual conduct with a minor, gross sexual imposition, and importuning. Appellant also appeals the trial court's denial of his motion for a new trial. For the reasons set forth below, we affirm appellant's convictions and the court's denial of his request for a new trial.

{¶ 2} On March 25, 2016, appellant was indicted on one count of rape of a child less than ten years old in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree (count one); one count of rape of a child older than ten, but less than 13 years of age in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree (count two); one count of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), a felony of the third degree (count three); two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), felonies of the third degree (counts four and six); and two counts of importuning in violation of R.C. 2907.07(A), felonies of the third degree (counts five and seven). The charges set forth in counts one through five involved the victim K.W., and the charges set forth in counts six and seven involved K.W.'s younger sister, A.W. Appellant was alleged to have engaged in inappropriate sexual conduct and contact with K.W. from 2005 until March 2016, while the victim was between the ages of four and 14. Appellant was alleged to have fondled K.W.'s erogenous zones, digitally penetrated her vagina on a number of occasions, with the penetration occurring prior to and subsequent to K.W. reaching ten years of age, and solicited K.W. to engage in vaginal intercourse with him when K.W. was less than 13 years old. With respect to A.W., appellant was alleged to have solicited A.W. to engage in sexual activity with him and subjected her to unwanted touching by fondling her vagina from the time she was 11 years old until she was 13 years old.

{¶ 3} Appellant's conduct came to light on March 18, 2016, after A.W. told a classmate about the sexual abuse. The classmate told his parent, who contacted Children Protective Services ("CPS"). CPS then contacted A.W.'s mother to disclose the abuse allegations and request that both A.W. and K.W. be transported to Children's Hospital for an examination. K.W. had been at softball practice when the abuse allegations were disclosed. A family friend picked K.W. up from practice to take her to Children's Hospital. When the

family friend picked K.W. up and told her about the allegations made against appellant, K.W stated that "inappropriate conduct had occurred since she was four years old."

{¶ 4} At Children's Hospital, A.W. and K.W. individually met with a hospital social worker prior to being physically examined by a doctor. A.W. told the social worker that on multiple occasions appellant had fondled her genital area, kissed her on the neck, and breathed on her neck. K.W. told the social worker appellant had fondled her vagina, digitally penetrated her vagina, touched her buttocks and breasts, and tried to kiss her breasts. AW and KW were then examined by a physician. The examinations revealed no physical evidence of sexual assault or abuse.

{¶ 5} On March 18, 2016, after learning about the abuse allegations A.W. had made against appellant, A.W.'s and K.W.'s mother (hereafter, "Mother") called appellant to ask him about the allegations. Appellant told Mother that he "didn't do anything to [A.W.]." Appellant claimed A.W. was "just mad at him" because they had recently gotten into a fight after A.W. threw Gatorade on him and he responded by smacking her. Mother and appellant shared a second phone call on March 18, 2016, after Mother learned that K.W. had also alleged appellant sexually abused her. During this phone call, appellant kept apologizing to Mother, telling her he was sorry and that "he did touch [K.W.] but he did not touch [A.W.]." Appellant was upset and crying during this call, and he threatened to kill himself.

{¶ 6} Mother told others of appellant's threats to kill himself, and the police were dispatched to appellant's residence. Appellant was transported to Clermont Mercy Hospital, where he was placed on a psychiatric hold that lasted approximately eight days. While hospitalized, appellant called Mother, and Mother, who had a friend with her, placed the call on speakerphone. Both Mother and the friend heard an upset and emotional appellant state that he had touched one of the girls, K.W., but not the other girl, A.W.

{¶ 7} Appellant's friend and co-worker visited appellant while he was hospitalized. Appellant told his friend, "I screwed up" and "I just made a mistake. I did it one time. I made a mistake." Appellant also told his friend that he "want[ed] to kill people like this."[1]

{¶ 8} After being released from the hospital, appellant was arrested and indicted on the abovementioned charges. Appellant pled not guilty to the charges. While the case was pending, appellant's attorneys met with the victims to discuss the abuse allegations. The attorneys met with each girl one-on-one, without their mother or another adult present, on June 22, 2016 and July 11, 2016. The interviews were recorded. At the time of the interviews, K.W. and A.W. were, respectively, 14 and 13 years old.

{¶ 9} At the start of the defense attorneys' June 22, 2016 interview with K.W., the attorneys disclosed that it was their "job to try and sometimes confuse people, sometimes get a different story than what is really there." The attorneys expressed their belief that appellant was a "good person" who cared tremendously about his family and whose life was on the line as a result of the allegations K.W. and A.W. had levied against him. The attorneys explained that if K.W.'s and A.W.'s stories were believed by a jury, appellant would go to prison for a lifetime and he would likely not get the help he needed. The attorneys then asked K.W. to describe the abuse she sustained in detail. K.W. did so, telling the attorneys the same information she had disclosed on March 18, 2016.

{¶ 10} Appellant's defense attorneys then met with A.W. alone on June 22, 2016, telling her at the outset that if she changed her story, she would not get into any trouble. One attorney stated:

> [I]f the story that you have told is changed in any way, it's
> not gonna get you in any kind of trouble, okay? You're not

---

1. Appellant's friend informed investigators of the aforementioned conversation he had with appellant while appellant was hospitalized. At trial, appellant's friend added additional details that were not disclosed to investigators. Appellant's friend claimed that appellant had disclosed the "mistake" he made was hitting the girls and "rubb[ing] [K.W.'s] belly one night." The friend stated he had not provided the "belly rubbing" explanation to law enforcement because the officer he spoke with "never asked."

going to go to juvenile court as a result of it. You're not going to be put in detention. You're not going to be taken away from your mom. So, if the story you've already told would happen to be different than what you ultimately tell if this case goes to trial, goes into a courtroom, if that story is different than what you've already told, you're not in any kind of trouble for doing that. Do you understand what I'm saying there?"

{¶ 11} The attorneys further advised A.W. that if she told the same story in court that she told on March 18, 2016, and it was believed, appellant would "in all likelihood * * * be going to prison. * * * [T]hat is the consequence of where we are today, okay." A.W. maintained that the information she disclosed on March 18, 2016 was the truth.

{¶ 12} On July 11, 2016, appellant's defense attorneys conducted a second interview with K.W. and A.W. When meeting with K.W., the attorneys informed K.W. that if she maintained her story, appellant would go to prison for a long time and she could lose her home, as her mother was dependent on financial assistance from appellant to make ends meet. The attorneys asked K.W. if, realizing the consequences of maintaining her story, she wanted to recant. The following discussion took place:

> [DEFENSE ATTORNEY]: Anyway, * * * as we talked about the last time, you do know the consequences of the statements you made. And the consequences primarily deal with [the appellant] in terms of long term issues that he's going to have to deal with. But those consequences also have to deal with your mom because of financial issues with [appellant] not working or being unable to work and being in prison, clearly the house is going to go unless she can find a way to, you know, make the payments. So, so all of those are consequences not necessarily of you but consequences of ultimately what we understand you're going to say in the courtroom. Have you given any further thought to that? As far as what you're going to say?
>
> [K.W.]: (No audible response.)
>
> [DEFENSE ATTORNEY: No? Recognizing the consequences you're not in a condition or in a position to recant anything? And what I mean by recant, basically saying what I said before was not really correct and what I'm saying now is correct and here's

the reason I said what I said for whatever reason that may be. I mean, before you answer that, have you thought about that?

[K.W.]: No.

[DEFENSE ATTORNEY]: Now, can you tell me why?

[K.W.]: Because everything I've said is correct.

{¶ 13} Later in the interview, appellant's attorneys told K.W. that she could not control what happened to appellant, but she could control what she said in court. The following discussion occurred:

> [DEFENSE ATTORNEY]: Okay, anything we haven't asked you that you can tell us that would help us out a little bit? And you indicated before that you, what you wanted to see happen is that [appellant] get help. Um, what kind of help do you want him to get?
>
> [A.W.]: Um, I don't think he should go to jail.
>
> [DEFENSE ATTORNEY]: Okay and what if we told you you don't have any control of that? You could, you could tell the judge, "I don't want him to go to jail, I want him to get help. I want him to go to a hospital. I want him to go to a rehab center. He's addicted. I want him, I want him helped. I want him to be * * * good * * *." And the judge can not pay any attention to you at all. So you really have no voice in the matter other than what your story would be.
>
> [SECOND DEFENSE ATTORNEY]: That's the only control you have. What you tell him.
>
> [DEFENSE ATTORNEY]: But you can control what you say, okay?
>
> [K.W.]: Um-hum.

{¶ 14} Appellant's attorneys then interviewed A.W. a second time. A.W. continued to maintain that the information she disclosed on March 18, 2016 was the truth and that appellant had inappropriately touched her.

{¶ 15} Shortly after the July 11, 2016 interviews, A.W. and K.W. wrote letters recanting the abuse allegations. A.W. and K.W. gave the letters to their mother, who in turn provided the letters to defense counsel. The letters stated as follows:

> [A.W.'s Letter]: What I said about [appellant] is a lie. I lied because I was mad because he treats [K.W.] better than me and I got tired of it…and because he slapped me for getting gatorade on him.
>
> [K.W.'s Letter]: I lied about [appellant] touching me. I lied because I've been really mad at him lately, because he was so strict, especially with boys. I didn't mean to let this go on for this long, but everytime I talked to someone about it, I got too nervous to change my story. I was scared that I was going to be in trouble.

{¶ 16} Also, sometime after the July 11, 2016 interviews, K.W. appeared before a grand jury. During her grand jury testimony, K.W. discussed the June 22, 2016 and July 11, 2016 interviews and her letter of recantation. She indicated that what she had written in her letter was the truth and that "nothing happened" between herself and appellant. K.W. stated she had lied when she initially disclosed the abuse and when she spoke about the abuse with defense counsel during the June 22, 2016 and July 11, 2016 interviews.

{¶ 17} After learning of defense counsels' interviews with A.W. and K.W. and the letters of recantation, the state sought to compel discovery of the letters and the victims' statements in accordance with Crim.R. 16(H). Though the letters were turned over, defense counsel opposed turning over the recordings of the interviews, asserting appellant could not be required to disclose information that would tend to incriminate him under Crim.R. 16(H)(3) and the Fifth Amendment. In supplemental briefing, the state argued that not only were the interviews discoverable under Crim.R. 16, but the recorded interviews were relevant as they were believed to "contain statements that are prior to, and inconsistent with, recent recantation notes [written by the victims]." Further, the state argued the recordings were "evidence of intimidation of the state's witnesses" by the defendant, the victims' mother, and,

potentially, by appellant's defense attorneys. In their supplemental briefing, appellant's attorneys again argued the recordings were undiscoverable pursuant to appellant's Fifth Amendment rights and Crim.R. 16(H)(3). The attorneys further argued the recordings were not discoverable as the interviews were protected as the work product of counsel. Finally, appellant's attorneys invoked their own Fifth Amendment rights to prevent discovery of the recorded interviews, citing a concern over their possible prosecution on allegations of witness intimidation.

{¶ 18} The trial court held a hearing on the issue on November 28, 2016. The court ultimately overruled the state's motion to compel discovery of the recorded interviews. However, the court expressly "reserve[d] the right to rule on their disclosure and use at trial." Months later, in July 2017, the issue of the victims' recorded interviews was discussed at a pretrial hearing. The court reiterated that it was not making the recorded interviews discoverable, but advised defense counsel that "if the issue of recant comes in or comes up [at trial], the moment [the court] hear[s] that word, out of your mouth, [defense counsel], is the moment we're takin[g] a recess, and you're producing those statements." The court indicated that it had not yet heard the recorded statements or viewed the letters of recantation written by the victims, but it was unwilling to let either side "ambush" the other side at trial.

{¶ 19} On August 10, 2017, four days before appellant's trial was set to commence, defense counsel voluntarily, but "under strenuous objection," provided copies of the recorded interviews to the state as they anticipated introducing evidence of the victims' recantations at trial. Thereafter, upon agreement of the parties, transcripts of the June 22, 2016 and July 11, 2016 interviews were provided to the trial court for an in-camera review. Prior to trial commencing on August 14, 2017, the court heard arguments regarding the use of the recorded interviews. The state argued the interviews were "part of the girls' experience

throughout this case" and were "evidence of intimidation of a witness." Defense counsel argued the statements were inadmissible as there had been no intimidation of the victims and the statements constituted hearsay. The trial court concluded that the statements were admissible and allowed the state to use the interviews during its case-in-chief, over appellant's objection.

{¶ 20} At trial, K.W. testified that appellant had been touching her inappropriately since she was four years old and it had happened "too many" times to count. The abuse occurred inside her home in Brown County, inside a camper parked at her residence, and at a nearby lake. K.W.'s earliest memory of being sexually abused by appellant occurred when she was lying on the floor of her bedroom. Appellant placed his hand on her leg and started rubbing it. When he reached her upper thigh, he asked her for directions on whether he should rub up or down. Appellant ultimately put his hand on K.W.'s vagina, under her clothes.

{¶ 21} After that incident, appellant continued to sexually assault K.W. on a "more than weekly" basis. K.W. testified that starting before she was ten years old, and continuing until she reached the age of 14, appellant digitally penetrated her vagina. He also touched her breasts and bottom. K.W. stated that appellant asked to put his penis inside her, but she always told him "no." K.W. described instances when appellant would grant her privileges in exchange for sexual activity. For instance, appellant provided K.W. with permission to leave the home after K.W. allowed appellant to touch her inappropriately in the camper parked on her property.

{¶ 22} K.W. testified she met with appellant's attorneys on June 22, 2016 and July 11, 2016, and the recordings of those interviews were played for the jury. After listening to the recordings, K.W. testified that what she told appellant's attorneys about the abuse was true. K.W. was then asked about the letter of recantation she wrote after her second interview with appellants' attorneys and about her testimony before the grand jury. K.W. testified the

- 9 -

statements in her letter and her testimony before the grand jury were lies. K.W. lied because she did not want appellant to get in trouble. K.W. denied that her mother encouraged her to write the letter of recantation. On cross-examination, K.W. acknowledged her relationship with appellant had changed shortly before March 2016, as she and appellant disagreed about whether she should be permitted to date or ride in a vehicle with an older boy in whom she was romantically interested.

{¶ 23} A.W. testified at trial that she was 11 years old when appellant started inappropriately touching her. A.W. described appellant coming into her bedroom at night, rubbing her legs, and asking for directions on which way to move his hands until he ultimately started rubbing her vagina. A.W. denied that appellant ever penetrated her vagina while touching her. A.W. estimated appellant had touched her vagina over 20 times by the time she disclosed the abuse on March 18, 2016.

{¶ 24} Recordings of A.W.'s interviews with appellant's defense attorneys were played at trial, and A.W. testified that what she told the attorneys during the interviews was true – appellant had been inappropriately touching her. A.W. was questioned about the letter of recantation she wrote after the second interview, and she stated that the letter was not true. A.W. stated she only wrote the letter because her mother had pressured her to write it, telling A.W. that things would go back to normal and that they would "get [their] lives back together." According to A.W., her mother was present and told her what to say when the letter was written.

{¶ 25} On cross-examination, A.W. acknowledged that the day before she disclosed appellant's abuse to her friend at school, she and appellant had gotten into an argument. While riding in a vehicle together, A.W. spilled Gatorade on appellant and appellant slapped her in the face. A.W. responded by telling appellant she "hated him." A.W. also

acknowledged on cross-examination that she thought appellant treated K.W. better than her, but she denied that this caused her to make false allegations against appellant.

{¶ 26} A.W. and K.W.'s mother testified at trial about the phone calls she had with appellant when the victims' abuse allegations were first made and when appellant was hospitalized. Mother testified she was shocked when she first heard the abuse allegations. She also testified that she is disabled, has been unable to work since 2006, and is financially dependent on appellant's income for her livelihood. The same day the allegations surfaced against appellant, Mother began to worry about how she would make ends meet. Mother called a friend to request that the friend not cash a check that Mother had recently written. Mother denied discussing the financial problems she faced after appellant's arrest with K.W. and A.W., but acknowledged that they may have overheard her discussing the problems with her friends. Mother also denied that she ever asked A.W. or K.W. to change their stories or told them what to write in their letters of recantation.

{¶ 27} A family member who had visited with A.W., K.W., and their mother after the abuse allegations came to light testified that Mother had initially believed her daughters' statements, but things later changed. The family member overheard Mother tell A.W. and K.W. that if they persisted with their allegations, appellant could go to prison for a long time, they could lose their house and become homeless, and they could end up in foster care.

{¶ 28} Appellant took the stand in his own defense and denied sexually touching A.W. or K.W. Appellant testified about his relationship with the victims, explaining that his relationship with K.W. changed in 2016 when K.W. took a romantic interest in an older boy. Appellant did not want K.W. riding around in a vehicle with the older boy, as appellant's experiences as a volunteer firefighter had made him aware of the dangers and potential consequences of teenage driving. As for his relationship with A.W., appellant explained A.W. has always had behavioral issues and was prone to lying. Around the time A.W. had made

the abuse allegations, he and A.W. had gotten into a fight over her throwing Gatorade on him. Appellant admitted he backhanded A.W. in the face, and A.W. responded by saying, "I hate you. I hate you. I don't ever want to talk to you again. I hate you, and I'm going to the call the law on you."

{¶ 29} Appellant testified that when he first learned of K.W.'s and A.W.'s abuse allegations on March 18, 2016, he told the victims' mother that the claims were untrue and that he "didn't do nothing." Appellant testified he then started thinking about what he could have possibly done that would constitute improper touching of either victim and the only thing he could think of was "rubbing on [K.W.'s] belly" on one occasion when she had a stomach ache. Appellant stated K.W. had pulled her shirt up and he had rubbed her bare belly with his hand even though it felt "awkward." When the victims' mother called him to discuss the abuse allegations, the belly rubbing incident was in the forefront of his mind, and appellant told the victims' mother, "I swear to God, I've never touched [A.W.]" but he admitted to touching K.W. Appellant testified he was going to explain that he touched K.W. by giving her the belly rub, but as soon as he told Mother he touched K.W., Mother became angry and interrupted him before he could properly explain what occurred. He testified Mother would not calm down to listen to his explanation. Therefore, feeling hopeless at the accusations he faced and Mother's belief in the accusations, appellant stated, "there's no reason for me to live."

{¶ 30} After threatening self harm, appellant spent approximately eight days in the psych ward at Clermont Mercy Hospital. He spoke with the victims' mother while at the hospital, telling her, "I touched [K.W.], but I swear to God I never touched [A.W.]." He also told a friend that visited him at the hospital that he touched K.W. by rubbing her stomach and that "it was a mistake."

{¶ 31} After considering the testimony presented at trial, the jury found appellant guilty on all charges. Appellant was sentenced to life in prison without the possibility of parole. Subsequently, appellant filed a motion for new trial, arguing the trial court erred by failing to dismiss jurors who were biased against his trial attorneys for their efforts in interviewing the victims in June and July 2016. He also argued the court erred by allowing the jury to hear the recordings of his attorneys' interviews of K.W. and A.W. The trial court found no merit to appellant's arguments and denied his motion for a new trial.

{¶ 32} Appellant timely appealed his conviction and the denial of his motion for a new trial, raising two assignments of error for review.[2]

{¶ 33} Assignment of Error No. 1:

{¶ 34} THE TRIAL COURT ERRED WHEN IT REQUIRED THE DEFENSE TO PROVIDE INCULPATORY WORK PRODUCT TO THE STATE, AND ALLOWED THE SAME TO BE USED BY THE STATE AT TRIAL. FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE 1 SECTION 16, OHIO CONSTITUTION; CRIM.R. 16.

{¶ 35} In his first assignment of error, appellant argues the trial court erred by ordering defense counsel to turn over counsels' June 22, 2016 and July 11, 2016 recorded interviews with the victims to the state, as the recordings constituted "inculpatory work product" that was protected from disclosure by the Fifth and Fourteenth Amendments to the United States Constitution, Section 10, Article I of the Ohio Constitution, and Crim.R. 16. Further, appellant contends his right to a fair trial was prejudiced by the trial court's erroneous decision to allow the state to introduce the recordings at trial.

---

2. This court consolidated appellant's appeal of his conviction and his appeal of the denial of his motion for new trial. *See State v. Wallace,* 12th Dist. Brown Nos. CA2007-09-011 and CA2017-11-014 (Dec. 8, 2017) (Entry of Consolidation).

{¶ 36} As an initial matter, we note that the trial court did not order defense counsel to turn over the June 22, 2016 and July 11, 2016 interviews to the prosecutors during pretrial discovery. In fact, the court's December 15, 2016 Judgment Entry specifically overruled the state's motion to compel production of the recorded interviews prior to trial. The court noted, however, that it was "reserve[ing] the right to rule on their disclosure and use at trial." The trial court rendered its decision without hearing the recorded interviews, viewing a transcription of the interviews, or viewing the letters of recantation that were written by K.W. and A.W. after the interviews. When the issue of the interviews and letters was discussed at a pretrial hearing held on July 17, 2017, the court noted its prior ruling that the interviews were not discoverable. At that time the court, again without hearing the recorded interviews or viewing the letters of recantation, made a statement from the bench that "if the issue of a recant comes in or comes up [at trial], the moment that I hear that word, out of your mouth, [defense attorney], is the moment we're takin[g] a recess, and you're producing those statements; do you understand that?" The court's oral statement was never journalized in an entry.

{¶ 37} "It is well-established that a court speaks only through its journal entries and not by oral pronouncement or through decisions." *State v. Halsey*, 12th Dist. Butler No. CA2014-10-211, 2015-Ohio-3405, ¶ 14; *State v. Beyduk*, 12th Dist. Warren No. CA2017-10-144, 2018-Ohio-1690, ¶ 11, fn. 1. At the time defense counsel turned over the recorded interviews to the prosecutors, there was no court order requiring their production. Accordingly, under the circumstances presented in this case, defense counsels' actions in disclosing the recordings to the state must be viewed as voluntary.[3] We therefore need not

---

3. We note that subsequent to defense counsel providing the recorded interviews of K.W. and A.W. to the state, the parties agreed to provide transcripts of the recordings to the court for an in camera review. At that time, an agreed entry was placed on the record. The entry states that "despite * * * disclosing the alleged victim statements to the State of Ohio, the Defendant has and is preserving the disclosure issue for appeal." However, as discussed in the body of our opinion, the court did not order the recorded interviews' disclosure prior to

address appellant's arguments that the court erred when it required defense counsel to provide the recorded interviews to the state.[4]

{¶ 38} Turning to appellant's arguments regarding the admissibility of the recordings at trial, we first address appellant's constitutional argument that use of the recordings at trial in some way compelled him to be a witness against himself. The Fifth Amendment of the United States Constitution provides, in relevant part, that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." The privilege against self-incrimination is made applicable to the states through the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489 (1964). Similarly, Section 10, Article I of the Ohio Constitution provides, in relevant part, that "[n]o person shall be compelled, in any criminal case, to be a witness

---

defense counsel voluntarily turning them over. The court made a tentative, interlocutory, and precautionary ruling about how it would handle evidence of recantation *at trial*, indicating that it was likely to call a recess and require the recorded interviews of the victims be turned over to the state at that time, but the court never journalized an entry ordering disclosure of the recorded interviews. The agreed entry filed the day of trial cannot be used to manufacture or alter the events as they actually occurred. The record demonstrates defense counsel voluntarily turned over the recorded interviews prior to the court ordering their disclosure.

4. {¶ a} Even if appellant's trial attorneys' actions were not construed as voluntary and we considered the merits of appellant's disclosure arguments, his claims fail. Under the circumstances of this case, disclosure of the recorded interviews was appropriate and not a violation of Crim.R. 16 or appellant's constitutional rights. Crim.R. 16 was designed to "provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A). However, "[t]he language of Crim.R. 16 does not suggest that the rule was intended to be an all-encompassing declaration of the entire scope of permissible pretrial discovery." *State v. Simmons*, 87 Ohio App.3d 290, 292 (12th Dist.1993). A trial court retains discretion to grant discovery beyond the scope expressed in Crim.R. 16. *Id. See also State v. Landrum*, 53 Ohio St.3d 107, 119 (1990) ("Discovery beyond what the rules require is at the trial court's discretion"). Here, disclosure of defense attorneys' recorded interviews of the victims was necessary for the full and fair adjudication of the facts, as the interviews were relevant and necessary to understanding the events leading up to and surrounding the victims' recantations.

{¶ b} Further, as discussed more fully in the body of our opinion, as the constitutional privilege against compulsory self-incrimination adheres to the person, and not to information that may incriminate the person, disclosure of the recorded victims' statements did not violate appellant's rights under the Fifth and Fourteenth Amendments to the United States Constitution or Section 10, Article I of the Ohio Constitution. *See United States v. Nobles*, 422 U.S. 225, 233-234, 95 S.Ct. 2160 (1975). Finally, the attorneys' recorded interviews of the victims constituted "ordinary fact" or "unprivileged fact" work product, which meant their disclosure could be compelled upon a showing of "good cause." *See, e.g., State v. Hoop*, 134 Ohio App.3d 627, 642 (12th Dist.1999). Here, there was good cause to compel disclosure of the recorded interviews, as the interviews were relevant to the victims' statements of recantation. Disclosure of the interviews, therefore, was not an error.

against himself."

{¶ 39} As the United States Supreme Court has recognized, the "privilege against compulsory self-incrimination is an 'intimate and personal one,' which protects 'a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self-condemnation." *United States v. Nobles*, 422 U.S. 225, 233, 95 S.Ct. 2160 (1975), quoting *Couch v. United States*, 409 U.S. 322, 327, 93 S.Ct. 611 (1973). As such, the privilege is a personal privilege that adheres to the person and not to information that may incriminate the person. *Id.*, citing *Couch* at 328. Therefore, "the Fifth Amendment privilege against compulsory self-incrimination, being personal to the defendant, does not extend to the testimony or statements of third parties called as witnesses at trial." *Id.* at 234. Accordingly, there was no violation of appellant's constitutional rights against compulsory self-incrimination by admitting the recorded interviews. The fact that these recordings were elicited by defense counsel did not convert them into appellant's personal communications or invoke constitutional protections under the Fifth and Fourteenth Amendments to the United States Constitution or Section 10, Article I of the Ohio Constitution.

{¶ 40} To the extent appellant cites to the work-product doctrine or Crim.R. 16 for the contention that the recorded interviews should not have been admitted at trial, we overrule his arguments. Although the work-product doctrine, at its core, protects the mental thoughts and process of the attorney, "'[o]rdinary fact' or 'unprivileged fact' work product, such as witness statements and underlying facts, receive lesser protection." *State v. Hoop*, 134 Ohio App.3d 627, 640-642 (12th Dist.1999). "Written or oral information transmitted to the attorney and recorded as conveyed may be compelled upon a showing of 'good cause.'" *Id.* at 642, citing *Hickman v. Taylor*, 329 U.S. 495, 511-512, 67 S.Ct. 385 (1947). "Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts." *Hickman* at 511.

{¶ 41} Further, Crim.R. 16 does not act as a "limitation on the court's inherent power to control evidentiary matters." *Nobles*, 422 U.S. at 235, fn. 9.[5] "A trial court has broad discretion in the admission and exclusion of evidence and unless it clearly abused its discretion and appellant is materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Martin*, 12th Dist. Butler No. CA2007-01-022, 2007-Ohio-7073, ¶ 9. An abuse-of-discretion standard of review is a deferential review. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14. An abuse of discretion is more than an error of law or judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Perkins*, 12th Dist. Clinton No. CA2005-01-002, 2005-Ohio-6557, ¶ 8.

{¶ 42} In the present case, after reviewing in camera transcripts of the June 22, 2016 and July 11, 2016 recorded interviews, the trial court determined the recorded interviews were relevant to explain the circumstances leading up to and surrounding the victims' recantations. The court found that the entirety of the recorded interviews, including the questions appellant's defense attorneys asked the victims, should be admitted into evidence to provide the full picture of events leading up to the victims' recantations and trial testimony. The court found admission of the recorded interviews appropriate, as the victims were testifying at trial and would be subject to cross-examination about any prior statement they may have made. Having thoroughly reviewed the record, we conclude that the trial court did not abuse its discretion or violate the work product doctrine by admitting the recorded interviews at trial under the circumstances presented in this case. The recorded interviews were relevant and their admission into evidence necessary to explain the events surrounding

---

5. As we previously recognized in *State v. Simmons*, 87 Ohio App.3d 290, 292 (12th Dist.1993), Crim.R. 16 parallels Fed.R.Crim.P. 16. Therefore, although *Nobles* addressed Fed.R.Crim.P. 16, the Supreme Court's holding is instructive as it relates to Crim.R. 16.

the victims' recantations. Shortly after meeting with appellant's attorneys on July 11, 2016, where the victims were reminded of the possible consequences of their statements and asked by defense counsel whether they were in a position to recant anything, the victims wrote letters of recantation. The recorded interviews provided insight into the victims' conduct and allowed the jurors to make their own determination as to whether the victims were intimidated or pressured into recanting their stories.

{¶ 43} Appellant contends that even if the recorded interviews were properly admitted at trial, certain portions of the recordings should have been excluded. Specifically, appellant maintains that a portion of A.W.'s June 22, 2016 interview should have been excluded from evidence as A.W. was given the opportunity to vouch for the veracity of K.W.'s claims of abuse. During the interview, A.W. told defense attorneys that K.W. had told her "something happened" between K.W. and appellant, but K.W. had not given any details. One of appellant's attorneys then asked A.W., "Is there any reason why [K.W.] would be storying about it? Not telling the truth?" A.W. answered, "No, I don't think so."

{¶ 44} "A witness's opinion regarding the veracity of another witness is inadmissible." *State v. Combs*, 1st. Dist. Hamilton No. C-120756, 2013-Ohio-3159 ¶ 37. However, at trial, appellant did not object to this portion of A.W.'s recorded interview being admitted into evidence on the basis that it constituted improper vouching. As such, we review the admission of this portion of the recorded interview for plain error only. *See State v. Brannon*, 12th Dist. Clinton No. CA2014-09-012, 2015-Ohio-1488, ¶ 36. "An alleged error constitutes plain error only if the error is obvious and but for the error, the outcome of the trial clearly would have been different." *State v. Kinsworthy*, 12th Dist. Warren No. CA2013-06-053, 2014-Ohio-1584, ¶ 16. Conversely, an error is harmless if there is "overwhelming evidence of guilt" or "some other indicia that the error did not contribute to the conviction." *State v. Sims*, 12th Dist. Butler No. CA2007-11-300, 2009-Ohio-550, ¶ 34.

{¶ 45} Here, the admission of the statement that A.W. "[didn't] think" K.W. had a reason to lie did not affect appellant's substantial rights or influence the outcome of the proceeding. The state presented overwhelming evidence of appellant's guilt, including K.W.'s trial testimony detailing the sexual abuse and appellant's admission to K.W.'s mother that he had "touched K.W." Therefore, the admission of A.W.'s statement "vouching" for K.W. constituted harmless error.

{¶ 46} Appellant also contends that admission of the recorded interviews "in full" was prejudicial as their admission permitted the state to introduce a number of incriminating statements that were "new and different" from the victims' trial testimony. For instance, despite not testifying to the following at trial, K.W. mentioned during the recorded interviews that appellant engaged in sexual activity with her "for his enjoyment," that she was embarrassed she "let it go on for so many years," and that there were times appellant took her cell phone away and would only return it if she did "what he wanted [her] to do." One of these statements – that K.W. did not disclose the abuse as she was embarrassed she let it go on for so long – was referred to by the prosecutor during closing statements.

{¶ 47} Contrary to appellant's assertions, the admission of these statements through the recorded interviews was not prejudicial. In a large part, the statements made by the victims' in the recorded interviews were duplicative of the information the victims testified about at trial. The fact that appellant sexually abused K.W. "for his enjoyment" could be inferred from K.W.'s trial testimony that the touching occurred from the time she was four years old until she was fourteen years old and progressed from rubbing her vaginal area to digitally penetrating her vagina and asking for penile penetration. Further, K.W.'s statement that appellant sometimes took her cell phone away from her and would only return it if she did "what he wanted [her] to do" was consistent with her trial testimony that appellant granted her privileges in exchange for sexual activity. Finally, as for the fact that K.W. indicated

during her interview with defense counsel that she was embarrassed the abuse went on for so many years, neither the admission of this statement nor the prosecutor's mention of this statement during closing arguments was prejudicial to appellant. At trial, K.W. testified in detail about the nearly decade-long sexual abuse she had been subjected to by appellant. Given the overwhelming evidence presented at trial of appellant's guilt, the fact that K.W. indicated during the recorded interview that she was "embarrassed" the abuse went on so long was not materially prejudicial to appellant and did not have an affect on the outcome of the proceedings.

{¶ 48} Accordingly, as the trial court did not order disclosure of defense counsels' recorded interviews with the victims and the admission of the recorded interviews as evidence at trial was proper, we find no merit to appellant's arguments. Appellant's first assignment of error is, therefore, overruled.

{¶ 49} Assignment of Error No. 2:

{¶ 50} [APPELLANT'S] TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS. SIXTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16, OHIO CONSTITUTION; *STRICKLAND V. WASHINGTON*, 466 U.S. 668, 104 S.CT. 2052 (1984).

{¶ 51} In his second assignment of error, appellant argues he received ineffective representation by his trial counsel during the jury selection process as counsel failed to challenge biased jurors for cause and failed to ask questions to rehabilitate the allegedly biased jurors. During voir dire, the fact that appellant's attorneys spoke with K.W. and A.W. without anyone else present during the summer of 2016 was disclosed. One of appellant's attorneys asked the venire whether they would have "any issue with defense attorneys going to talk to the people that are accusing the person charged?" Several prospective jurors

indicated that, depending on the circumstances, the attorneys' actions in questioning the victims would be concerning. As relevant to the issue before us, two individuals who were seated on the jury – Juror M and Juror C – indicated it might be problematic if the minor victims did not have an adult or advocate present for the interviews.[6]

{¶ 52} Specifically, Juror M asked whether there were rules that governed an attorney's ability to contact witnesses and stated that, "if you talk to the victims, then hopefully there was an adult or a mentor or somebody there that was protecting them, to make them feel comfortable with the conversation, on both sides, I feel, like taking somebody that's responsible for them in addition to just the child. * * * I think, as a parent, that I would want to be there with my child to make them feel more comfortable."

{¶ 53} Juror C stated, "I think – if there was an advocate with the child and all parties were aware that it was taking place, I think it would be fine." When asked how Juror C would feel if there had been no adult present when the child was questioned by defense attorneys, Juror C stated,

> You know, it's tough. It depends on how old they are. But certainly that child is going to be intimidated.
>
> So it's difficult to judge, you know, the feelings of that child, whether they're going to tell the truth or – or not. I couldn't' say, you know, whether they would tell the truth or not.
>
> I think many children, if they're – depending on their age, are going to be intimidated by the suits.

{¶ 54} Appellant's trial attorneys did not challenge Juror M or Juror C for cause.

---

6. In his brief, appellant suggests that all prospective jurors had either "explicitly or implicitly * * * indicated they would 'have a problem' with the investigative techniques employed by [defense] counsel." Appellant then identified and quoted four prospective jurors who expressed concern over an adult not being present for the discussions. However, only two of these four jurors – Juror M and Juror C – were seated on the jury. To the extent that appellant attempts to argue he received ineffective representation by his trial attorneys for their actions as they related to "all prospective jurors," we reject his arguments. Appellant cannot establish he was in any way prejudiced by his attorneys' actions as they related to prospective jurors who were not seated on the jury and there is nothing in the record indicating the unseated prospective jurors' comments biased or prejudiced the empaneled jurors. *See State v. Hairston*, 4th Dist. Scioto No. 06CA3087, 2007-Ohio-4159, ¶ 12-14.

Appellant now contends his attorneys were ineffective for failing to challenge Juror M and Juror C for cause based on their bias and for failing to make "any effort to rehabilitate the jurors * * * [to] ensure that their bias would not work to [appellant's] disadvantage when they were later engaged in deliberations." Appellant argues there was "no conceivable strategic reason" for his attorneys' actions and contends that that the inclusion of the biased jurors prejudiced his right to a fair and impartial trial.

{¶ 55} To prevail on an ineffective assistance of counsel claim, an appellant must establish that (1) his trial counsel's performance was deficient and (2) such deficiency prejudiced the defense to the point of depriving the appellant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052 (1984). Trial counsel's performance will not be deemed deficient unless it "fell below an objective standard of reasonableness." *Id.* at 688. To show prejudice, the appellant must prove there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶ 56} The Ohio Supreme Court "has consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how * * * counsel might have voir dired the jury differently.'" *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 205, quoting *State v. Mason*, 82 Ohio St.3d 144, 157 (1998). "[C]ounsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539 (2001). "[T]rial counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Setty*, 12th Dist. Clermont Nos. CA2013-06-049 and CA2013-06-050, 2014-Ohio-2340, ¶ 60, citing *State v. Hendrix*, 12th Dist. Butler No.

CA2012-05-109, 2012-Ohio-5610, ¶ 14. It is not the role of the appellate court to second guess the strategic decisions of trial counsel. *Id.*

{¶ 57} "A person called as a juror can be challenged for cause when the 'juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state.'" *State v. Cruz,* 12th Dist. Butler No. CA2012-03-059, 2013-Ohio-215, ¶ 29, quoting Crim.R. 24(C)(9). "When a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant '*must* show that the juror was *actually biased* against him.'" (Emphasis sic.) *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 67, quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir.2001).

{¶ 58} In the present case, appellant cannot establish either prong of the *Strickland* test or demonstrate that Juror M or Juror C was actually biased against him. The record reflects that after the jurors, including Juror M and Juror C, expressed their thoughts about counsel talking to the victims alone and the possible credibility problems of statements made during such interviews, the trial court interjected and advised the jurors as follows:

> THE COURT: And this, again, gets back to I will instruct you on all of the tools that you're supposed to do and how your supposed to determine the credibility of the witness, and I will give you that instruction and you will apply that instruction.

{¶ 59} The court clarified with all individuals sitting on the jury – including Juror M and Juror C, that they understood appellant was presumed innocent, that they would only listen to the evidence heard in the courtroom during trial, and that they would apply the law as instructed by the judge. Further, the court engaged in the following discussion with Juror C:

> THE COURT: Okay. And your job is to determine what did or did not happen on a – on a date or series of dates based upon what you hear within the confines of these four walls. Can you do that?
>
> [JUROR C]: Yes, sir.
>
> THE COURT: And can you do it fairly and impartially?

[JUROR C]: Yes, sir.

{¶ 60} Similarly, the court engaged in the following discussion with Juror M:

THE COURT: [I]f you sit on this case, you're going to take an oath to follow [the court's] instructions, right? * * * Will you do that?

[JUROR M]: Yes.

THE COURT: Will you do it fairly and impartially?

[JUROR M]: Yes, Your Honor.

{¶ 61} Given the foregoing discussions, it is apparent that the trial court instructed all jurors, including Juror M and Juror C, about their duties to remain fair and impartial. Both Juror M and Juror C expressly indicated their ability to remain fair and impartial and to follow the trial court's instructions. As a "presumption exists that the jury has followed the instructions given to it by the trial court," we find that appellant cannot establish the jurors' actual bias or that he was prejudiced in this case. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 194. *See also Pickens*, 2014-Ohio-5445 at ¶ 213-214. There is nothing in the record to indicate Juror C, Juror M, or any other juror was actually biased against appellant for his attorneys' actions in interviewing the victims during the summer of 2016. Neither Juror C nor Juror M indicated they would hold appellant's attorneys' actions against him in determining his guilt or innocence. As both Juror C and Juror M expressed an ability to be fair and impartial, neither needed to be rehabilitated by further questioning by defense counsel. *See, e.g., State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, ¶ 130-132 (noting that there is no need for counsel to attempt to rehabilitate a prospective juror when the juror has not made a statement indicating actual bias). Appellant's claim of ineffective assistance of counsel is, therefore, without merit and his second assignment of error is overruled.

{¶ 62} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.

- 24 -