[Cite as *State v. Marcum*, 2022-Ohio-3576.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29300 |
| | : | |
| v. | : | Trial Court Case No. 2021-CR-1947 |
| | : | |
| JOSHUA MARCUM | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 7th day of October, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek, Ohio 45434
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Joshua Marcum ("Marcum") appeals from his convictions after a jury trial in the Montgomery County Court of Common Pleas. Marcum contends that he was denied a fair trial and received ineffective assistance of counsel when his trial counsel failed to object to the testimony of a witness for the State, who commented on the veracity of the complaining witness, and to the State's reference to this testimony in its closing statement. For the reasons that follow, we affirm Marcum's convictions.

I.      Facts and Course of Proceedings

{¶ 2} On June 23, 2021, a Montgomery County grand jury indicted Marcum on the following nine counts: two counts of rape (by force or threat of force), first-degree felonies in violation of R.C. 2907.02(A)(2); two counts of rape (substantially impaired victim), first-degree felonies in violation of R.C. 2907.02(A)(1)(c); one count of gross sexual imposition (by force), a fourth-degree felony in violation of R.C. 2907.05(A)(1); one count of gross sexual imposition (substantially impaired victim), a third-degree felony in violation of R.C. 2907.05(A)(2); one count of kidnapping (felony or flight), a first-degree felony in violation of R.C. 2905.01(A)(2); one count of kidnapping (sexual activity), a first-degree felony in violation of R.C. 2905.01(A)(4); and one count of kidnapping (terrorize or inflict physical harm), a first-degree felony in violation of R.C. 2905.01(A)(3). These nine counts related to events that transpired on the morning of June 12, 2021, involving Marcum and "Jane Doe."[1]

_____

[1] We use the fictitious name Jane Doe to protect the identity of the complaining witness.

{¶ 3} A jury trial was held on October 4-8, 2021.   Several witnesses testified for the State, and Marcum testified on his own behalf.   Lucas Pyles, a firefighter paramedic for Trotwood Fire and Rescue, Station 72, testified that Jane Doe came to the fire station on June 12, 2021.   According to Pyles, Doe stated that she had been sexually assaulted and identified Marcum as the perpetrator.   Trial Tr. p. 37-38.   Pyles testified that he did not believe Doe was under the influence of drugs when she was at the station.   *Id.* at 43-44, 54.   Pyles also described Doe as "emotionally distraught" and "very believable."   *Id.* at 37.

{¶ 4} Jane Doe testified next for the State.   She has two daughters who were ages 8 and 13.   *Id.* at 58.   In June 2021, she lived in Fairfield, Ohio, and was not familiar with the Dayton area.   *Id.* at 59.   During the week leading up to the night and morning in question, Doe was struggling with the anniversary of her father's death and a recent, unexpected break-up with her boyfriend.   *Id.* at 60.   She met Marcum on the internet through the Facebook dating app on June 11, 2021.   *Id.* at 61-62.   They exchanged several messages and then had two video chats.   *Id.* at 62-75.   According to Doe, she invited him to come to her house for drinks that evening.   *Id.* at 74.   At that time, her oldest daughter was sleeping upstairs in Doe's residence.   *Id.* at 75.   Although her oldest daughter was pretty independent, Doe would not leave her alone in the house overnight.   *Id.* at 137.

{¶ 5} Marcum arrived at Doe's residence at around midnight.   *Id.* at 76-77.   Doe was tipsy from drinking rum and coke by the time Marcum arrived.   *Id.* at 75-76.   Marcum stated that he needed to buy something to drink, so Doe suggested a gas station close

to her place and accompanied him there. *Id.* at 79. Both of them smoked some marijuana while they were in the gas station parking lot. Marcum bought a 6-pack of Smirnoff alcohol. *Id.* at 80-82. He handed an open bottle of the Smirnoff to Doe. *Id.* at 141-142. According to Doe, everything became foggy for her soon after she began drinking the Smirnoff. *Id.* at 83-84. She expected them to return to her house from the gas station, but Marcum pulled out of the gas station and headed in the opposite direction. *Id.* at 84-85.

{¶ 6} The next thing Doe remembers is having her head down in a couch and her butt up in the air while Marcum had his penis inside Doe's rectum. She did not recognize the couch and did not know where they were. Her hands were tied behind her neck with a wire hanger, and Marcum was holding a knife against the back of her neck. *Id.* at 85-87. Marcum alternated between putting his penis into her vagina and rectum. *Id.* at 89. Marcum also rubbed something on her vagina that caused a burning sensation. *Id.* at 90-91. He then forced his penis down her throat. *Id.* at 93-94. During this oral sex, Doe saw the knife Marcum was holding. *Id.* at 95. Doe stated that she did not consent to any of the sex and she was "cloudy" mentally during the entire time. *Id.* at 91-92, 94.

{¶ 7} Marcum left the building, and Doe proceeded to untie her hands using her mouth. *Id.* at 97. She then heard her phone vibrating and found it in a red toolbox. *Id.* at 98-99, 157-158. She called her brother and left a voicemail. *Id.* at 99. According to Doe, she was not thinking clearly and subsequently regretted not calling 9-1-1 when she had the opportunity. *Id.* at 159-160, 177-178.

{¶ 8} Marcum returned to the building, and Doe told him that she had to pee.

Marcum took her outside and held a knife to her as she peed. Doe was baffled that it was daylight outside. *Id.* at 102. Marcum then went into the house that was next to the garage in which they had sex. While he was in the house, Doe began taking pictures of the area for proof and to figure out where she was. *Id.* at 105. Marcum came back out of the house holding a butcher knife and placed it against Doe's stomach. He told her to get into a Suburban vehicle, which was different than the Pontiac Vibe that he had picked her up in the night before. *Id.* at 106-109.

{¶ 9} Doe begged Marcum to take her home but instead he drove her to a cemetery and a gas station. *Id.* at 109-110. Then he drove her back to the garage where he had raped her. *Id.* at 115. There were a man and a woman inside the house next to the garage. The woman eventually came out of the house and told Doe to shut up or she would release the dogs on her. *Id.* at 116. Subsequently, Marcum said that he would take Doe home. Marcum stopped for gas at a gas station. When they exited the gas station and stopped at a stop sign, Doe jumped out of the car and ran to the car behind them. The man and woman inside the car agreed to take her to a nearby fire station. *Id.* at 117-121.

{¶ 10} At the fire station, Doe told the firefighters that she had been raped and kidnapped. She agreed to be taken to the hospital for a sexual assault examination. Office Sherri Jackson rode with her in the ambulance to the hospital. *Id.* at 131. Doe's mother and brother came to the hospital. *Id.* at 133.

{¶ 11} On cross-examination, Doe conceded that she could lose her current job if it turned out that she had willingly gone to Marcum's place and used drugs. *Id.* at 139-

141. She also admitted that she had lied to both her brother and the emergency responders when she told them that she had met Marcum in a bar. *Id.* at 142. She could not explain why she did not call 9-1-1 when she had the opportunity other than that she had panicked. *Id.* at 159-160. When asked why she did not run away from Marcum's place, Doe explained that she had no idea where to run and was extremely sore from what Marcum had done to her. *Id.* at 162-163.

{¶ 12} Jordan Schneider, a full-time forensic examiner with S.A.N.E. of Butler County, testified next for the State. S.A.N.E. stands for Sexual Assault Nurse Examiner. *Id.* at 195-196. Schneider examined Doe and noted bruising on her rectum, an abrasion to her cervix, white fluid in her vagina, black debris in her vagina, and bruising on her wrists. *Id.* at 210-217. During the almost four-hour exam, Doe was anxious, crying, and pacing. *Id.* at 217-219.

{¶ 13} Sherri Jackson, a police officer for the City of Trotwood, also testified for the State. Officer Jackson was dispatched to the firehouse on June 12, 2021, to assist with a female who was visibly upset, crying, and saying she had been abducted and raped. *Id.* at 223. She gathered information from Doe and transported an examination kit to a refrigerator. *Id.* at 230-231. On cross-examination, Officer Jackson stated that Doe had told her she did not call 9-1-1 because she did not have her phone. But on re-direct examination, Officer Jackson stated that she did not ask Doe why she did not call 9-1-1. *Id.* at 233-234.

{¶ 14} Zachery Miller, a police officer with the City of Trotwood, testified next for the State. Officer Miller testified that he believed Doe was under the influence when she

was at the fire station. *Id.* at 238. He assisted in collecting evidence at the crime scene located at 8780 Post Town Road in Trotwood. Doe's hoodie and underwear were found at the scene. *Id.* at 247-248. The police also found 3 Smirnoff bottles and a glass pipe with a bowl, which are commonly used to smoke methamphetamine. *Id.* at 244, 251.

{¶ 15} Marvin Scott Broyles, who lived at 8780 Post Town Road with his stepdaughter, also testified for the State. *Id.* at 257. According to Broyles, Marcum had two keys to the garage at that property. Broyles saw Doe on June 12, 2021, walking to and from Marcum's vehicle. He did not notice anything out of the ordinary in Doe's demeanor. But he stated that she kept yelling that she wanted to go home. *Id.* at 261, 263, 269-270. Broyles's adult stepdaughter told Broyles that Doe sounded aggravated and mentioned that she (Doe) was going to miss a recital. *Id.* at 271.

{¶ 16} Broyles's stepdaughter, Tammy Burton, also testified at the trial; she lived with Broyles at 8780 Post Town Road. *Id.* at 274. Burton remembered seeing Doe on her stepfather's property on June 12, 2021. According to Burton, Doe was yelling at Marcum to take her home, was crying, and said she needed to do her daughter's hair for a dance recital. *Id.* at 280-283. Burton started getting upset and told Doe to shut up. *Id.* at 283. Burton noted that Marcum appeared intoxicated that morning and that Doe mentioned Marcum had a knife. *Id.* at 286, 288. She testified that she did not threaten to put the dogs on Doe. *Id.* at 290.

{¶ 17} Timothy Ziegler testified at trial. He visited Broyles and Burton on the morning of June 12, 2021. He noted that Doe was freaking out and was hysterical, but she was not crying. *Id.* at 296, 299. She said she needed a ride home and that Marcum

had a knife.   *Id.* at 296.   Ziegler reassured her that she was safe there while she was in front of everybody.   *Id.* at 300.

{¶ 18} Doe's brother, who is six years older than Doe, testified that she was a great mother to her children.   *Id.* at 303-304.   He described the voicemail that Doe left him as bone chilling.   While at the hospital, Doe hugged him very tightly.   *Id.* at 312-314.   Doe subsequently had a panic attack when she went from the inside of a restaurant out into the bright sunshine.   *Id.* at 315.

{¶ 19} Several witnesses also testified for the State regarding the evidence obtained from Doe, Marcum, and the crime scene.   Matt Buddo, a detective with the City of Trotwood Police Department, testified regarding a DNA swab collected from Marcum. *Id.* at 319-320.   Michael Molchan, a Sergeant with the Trotwood Police Department, testified about his search of Marcum's black Pontiac and the recovery of two Smirnoff bottle caps.   *Id.* at 325-345.   Logan Schepeler, a forensic scientist at the Ohio Bureau of Criminal Investigation ("BCI"), testified about the results of DNA samples taken from the knife, Doe, and Marcum.   He opined that there was a DNA match between Marcum and DNA samples taken from Doe's vagina and right buttock.   *Id.* at 346, 377-378.   Beth Underwood, a forensic scientist at BCI, testified that the liquid obtained from the Smirnoff bottle at the crime scene contained methamphetamine.   She could not opine as to how much methamphetamine was in the liquid.   *Id.* at 396-398.   Kialee Bowles, a forensic toxicologist with the Miami Valley Regional Crime Lab, testified that Doe's urine sample from her examination showed, among other things, the presence of amphetamine, methamphetamine, and the chemical commonly found in marijuana.   *Id.* at 404, 421-436.

{¶ 20} Detective Bethany Morrissette of the Trotwood Police Department testified about obtaining a search warrant for the garage at 8780 Post Town Road and what was found in the search.   Detective Morrissette saw, but did not collect, the wire hanger as evidence.   Based on information that was relayed to Morrissette, she collected a white rope rather than the white wire.   *Id.* at 467, 503.   She also assisted Doe in trying to locate the gas station near the crime scene that Doe and Marcum had visited, but Doe was not able to confirm what gas station it was.   *Id.* at 497-501.   They did locate the cemetery through which Doe stated Marcum had driven her.   *Id.* at 476-480.

{¶ 21} Marcum testified on his own behalf at trial.   He was 44 years old and was a mechanic and landscaper who has five children.   *Id.* at 519-520.   Marcum had previously committed a number of crimes involving violence.   *Id.* at 520, 664-665.

{¶ 22} According to Marcum, Doe and he made plans to go to his place while they were video chatting.   *Id.* at 522-523.   After Marcum picked up Doe and they made a stop at a gas station, Marcum drove onto the highway, and Doe began rubbing his leg and his penis as he was driving.   *Id.* at 524.   They were drinking Smirnoff and smoking a marijuana blunt that he had rolled.   When they arrived at the garage at 8780 Post Town Road, they had consensual sex for an hour.   *Id.* at 525.   Someone knocked on the garage door around 3:00 a.m.   Marcum picked up a knife and took it outside to check on who knocked.   *Id.* at 525-526.   He saw Tammy Burton's cousin, who offered him some methamphetamine.   Marcum was a recovering addict and took the methamphetamine.   *Id.* at 528.   Doe wondered if it was cocaine.   Marcum explained to her that it was methamphetamine and would intensify sex.   They both decided to try it.   *Id.* at 531.

{¶ 23} Marcum suggested that they both ingest the methamphetamine off of each other's genitalia. *Id.* at 531. According to Marcum, he reduced some of the methamphetamine to powder form and placed it on his penis for Doe to swallow while performing oral sex. When Doe proceeded to put his penis in her mouth, she said the methamphetamine was nasty and took a drink of the Smirnoff. *Id.* at 532-533. Marcum then placed some of the methamphetamine on Doe's vagina and licked it off. *Id.* at 534-535. Marcum testified that the methamphetamine was potent. *Id.* at 643.

{¶ 24} Marcum stated that he used the wire coat hanger to stir the methamphetamine pipe. He noted that the wire hanger was not long enough to tie someone up. *Id.* at 538. Marcum smoked some of the methamphetamine and then blew it into Doe's mouth during a kiss. *Id.* at 540. After he did this, she performed oral sex on him. *Id.*

{¶ 25} According to Marcum, Doe then started to get paranoid and had to pee. When she went outside to pee, she suddenly panicked and said she had to get home. *Id.* at 541-543. Marcum had her get into the Suburban because it had air conditioning. But she was very paranoid in the Suburban and kept thinking someone was in the back seat. Doe even opened the door while the vehicle was moving. *Id.* at 544-545. Marcum drove Doe back to 8780 Post Town Road, because she had forgotten her garage door opener there. *Id.* at 547. Doe kept getting louder about needing to get home to a recital. *Id.* at 548-550. Marcum felt too impaired to drive her home and he asked Boyles and Burton to drive her home. *Id.* at 551. Doe was screaming impatiently, but was not crying or fearful. *Id.* at 552. Marcum denied having a knife on him other than when

someone knocked on the garage earlier that morning. *Id.* at 552-553.

{¶ 26} Marcum ultimately decided to try to drive Doe home. He described Doe as very paranoid and asking about a knife. *Id.* at 556-559. Doe ultimately jumped out of his car when they were stopped at a stop sign. He left her and drove away. *Id.*

{¶ 27} Marcum reiterated that he did not kidnap or rape Doe or force her to do anything. *Id.* at 567-568, 657-658. He explained that their plan from the video chat was to have sex at his garage, and they ultimately had vaginal, anal, and oral sex. *Id.* at 620, 624, 630.

{¶ 28} The jury found Marcum guilty on two counts of rape (substantially impaired victim), first degree felonies, and one count of gross sexual imposition (substantially impaired victim), a third-degree felony. Marcum was found not guilty on the remaining six counts in the indictment. The trial court sentenced Marcum to a minimum of 20 years and a maximum indefinite sentence of 25 years in prison.

{¶ 29} Marcum filed a timely appeal from his convictions.


II.     Marcum Was Not Denied A Fair Trial

{¶ 30} Marcum's second assignment of error states:

MARCUM WAS DENIED A FAIR TRIAL UNDER THE CONSTITUTIONS OF THE UNITED STATES AND OHIO WHEN A WITNESS FOR THE STATE TESTIFIED ABOUT THE COMPLAINING WITNESSES' VERACITY.

{¶ 31} The State's first witness was Lucas Pyles, the firefighter paramedic who

encountered Jane Doe at the fire station.   Trial Tr. p. 34.   He testified, in part:

Q:      All right.   Describe the demeanor of this individual.

A:      Very obviously emotionally distraught.

Q:      What do you mean by that?

A:      My time in fire service, very believable, be a true rape case.

*Id.* at 37.   There was no objection to this testimony.

{¶ 32} During closing arguments, counsel for the State reminded the jury of Pyles's testimony:   "And what do we hear about when we get to the fire department?   Lucas Pyles was the first witness on this case.   And what did he testify to?   That she appeared very believable and that this was a true rape case."   *Id.* at 718.   Marcum's trial counsel also did not object to these comments in the State's closing argument.

{¶ 33} Marcum contends that allowing Pyles's testimony and the State's reference to the testimony during its closing argument "was an obvious defect in these trial proceedings which was a credibility contest between Marcum and Jane Doe.   And this error affected Marcum's substantial rights in that Marcum was denied a fair trial."   Brief of Appellant, p. 12.   According to Marcum, Pyles's testimony "tipped the balance in favor of the State, and Marcum's convictions should be reversed so that he may receive a fair trial."   *Id.*

{¶ 34} The State responds that any error in admitting the challenged testimony was harmless beyond a reasonable doubt, "because the trial court's admission of the challenged statement did not prejudicially affect the fairness or outcome of Marcum's trial."   Brief of Appellee, p. 24.   According to the State, the jury appears to have believed

Marcum's version of events, at least in part, which led to the not guilty verdicts on six of the nine counts in the indictment. But even under Marcum's version, the jury could have reasonably found him guilty of the remaining three counts. *Id.* at 23-24. Further, the jury was able to review video evidence of Doe's demeanor at the fire house, so the jury had its own independent basis for evaluating her credibility, apart from Pyles's opinion. *Id.* at 24.

{¶ 35} In *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442 (6th Dist.), the Sixth District addressed a situation in which one witness testified regarding the credibility of another witness. The court stated, in part:

> In *State v. Boston* (1989), 46 Ohio St.3d 108, the Ohio Supreme Court held that a witness may not express his belief or opinion as to the credibility of another witness. *Id.* at 128-129. *Boston* involved allegations of sexual assault on a child in which the treating physician was allowed to state her opinion of the child's veracity, in effect "declar[ing] that [the child] was truthful in her statements." *Id.* The Supreme Court found that "the admission of this testimony was not only improper - it was egregious, prejudicial and constitutes reversible error." *Id.*

> Later, in *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, the Supreme Court again held that a detective's testimony that the accused "was being very deceptive" was inadmissible. *Id.* at ¶ 121-123 (citing *Boston*).

> In *State v. Hensley*, 6th Dist. No. L-03-1005, 2005-Ohio-664, this

court found reversible error when a police detective testified about the truthfulness of a witness, stating:

"It is well-established that a witness may not express his or her belief or opinion as to the credibility of another witness. * * * When a witness expresses an opinion as to the veracity of another witness, it has the effect of acting as a 'litmus test' on the key issue in the case and infringing on the role of the fact finder, 'who is charged with making determinations of veracity and credibility.' * * * This is particularly true when an investigating police officer expresses an opinion as to whether a witness is being truthful." (Emphasis added.) *Id.* at ¶ 38.

Given the foregoing precedent, it was error to permit Gross to testify that Richcreek was being "deceptive" and thus impliedly untruthful. The state is correct that *Boston* violations are subject to harmless-error review under Crim.R. 52(A). *State v. Allen*, 8th Dist. No 92482, 2010-Ohio-9, ¶ 50-51. However, we cannot say beyond a reasonable doubt that allowing the jury to hear Gross's testimony regarding Richcreek's "deceptive" responses was harmless. For better or worse, jurors view police officers as expert witnesses and give substantial weight to their opinions, particularly where the opinion is couched in terms of "previous experience with other cases." *State v. Kovac*, 150 Ohio App.3d 676, 2002-Ohio-6784, ¶ 38 (quoting *State v. Miller* (Jan. 26, 2001), 2d Dist. No. 18102). *Boston*

violations are more likely to be prejudicial in the context of a jury trial where the case "[is] essentially a 'credibility contest' between the victim and the defendant without independent evidence of the alleged crimes." *Kovac* at ¶ 40; *State v. Burrell* (1993), 89 Ohio App.3d 737, 746.

*Richcreek* at ¶ 104-108.

**{¶ 36}** The analysis in *Richcreek* was based on the extra weight a finder of fact, especially a jury, may put on the testimony of an expert or a police officer. It is understandable why the Supreme Court has strongly cautioned against allowing an expert or police officer to testify regarding whether another witness is telling the truth. Allowing such testimony invades the duty of the fact finder to determine the weight and credibility of witnesses. Similarly, statements by the State's counsel regarding whether a witness is being truthful (i.e., vouching for the witness) may prejudice a defendant, especially in a jury trial involving two distinct stories told by two primary witnesses.

**{¶ 37}** Ultimately, it is for the trier of fact to determine the credibility of witnesses. Therefore, a witness's opinion regarding the veracity of another witness is not admissible. *State v. Combs*, 1st Dist. Hamilton No. C-120756, 2013-Ohio-3159, ¶ 37. However, at trial, Marcum's counsel did not object to Pyles's testimony or the State's reference to it in its closing statement. As such, we review the admission of this testimony for plain error only. *State v. Wallace*, 2019-Ohio-442, 130 N.E.3d 999, ¶ 44 (12th Dist.). "An alleged error constitutes plain error only if the error is obvious and but for the error, the outcome of the trial clearly would have been different." (Citation omitted.) *State v. Kinsworthy*, 12th Dist. Warren No. CA2013-06-053, 2014-Ohio-1584, ¶ 16.

{¶ 38} To determine whether the outcome of the trial clearly would have been different, we must consider the evidence of record in relation to the counts on which Marcum was convicted.   Marcum was convicted of two counts of rape in violation of R.C. 2907.02(A)(1), which provides, in part:

> No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies:
>
> * * *
>
> (c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition[.]

{¶ 39} Marcum also was convicted of one count of gross sexual imposition in violation of R.C. 2907.05(A)(2), which provides, in part:

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> * * *
>
> (2) For the purpose of preventing resistance, the offender substantially impairs the judgment or control of the other person or of one of the other persons by administering any drug, intoxicant, or controlled substance to

the other person surreptitiously or by force, threat of force, or deception.

{¶ 40} The Ohio Supreme Court defines "substantial impairment" in terms of its common usage and has held that "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of [the] conduct or to control [the] conduct." *State v. Zeh*, 31 Ohio St.3d 99, 103-104, 509 N.E.2d 414 (1987).

{¶ 41} In order to convict Marcum of rape under R.C. 2907.02(A)(1), the State had to prove that Marcum had sexual conduct with Doe, that her ability to consent was substantially impaired, and that Marcum knew or had reasonable cause to believe that Doe was substantially impaired. Further, to convict Marcum of gross sexual imposition under R.C. 2907.05(A)(2), the State had to prove that Marcum had sexual contact with Doe and that he substantially impaired the judgment of Doe by administering a drug to her surreptitiously, by force, or through deception.

{¶ 42} Doe's testimony, if found credible by the jury, satisfied all of the elements of the rape and gross sexual imposition counts of which Marcum was convicted. She testified extensively that she was mentally cloudy after drinking a Smirnoff and that Marcum observed her smoking marijuana and drinking. Further, her testimony supported the allegations that he had intentionally and surreptitiously drugged her with methamphetamine and had sex with her against her will. Even more important to our analysis, here, however, is Marcum's testimony. His testimony also supported the guilty verdicts. He testified that Doe ingested alcohol and methamphetamine and smoked marijuana. Marcum characterized the methamphetamine as potent and noted how

paranoid Doe became as a result of the drug. Further, he testified to his own state after ingesting the same drugs, worrying about whether he was sober enough to drive Doe home. Also, he was unable to explain how the methamphetamine got into the Smirnoff bottle. In addition, other witnesses for the State explained that scientific tests showed that there had been methamphetamine and marijuana in Doe's urine sample and methamphetamine in the Smirnoff bottle found at the crime scene.

{¶ 43} Moreover, we do not believe that Pyles's single statement about Doe's credibility, even when amplified by the State in its closing argument, rose to the same potentially weighty level as a statement by a police officer or an expert, especially in light of the fact that the jury had the opportunity to view a video from Doe's visit to the fire station on the morning of June 12, 2021. The jurors were able to view Doe's demeanor at the fire station for themselves and did not have to take the word of Pyles as to Doe's demeanor.

{¶ 44} The six not guilty verdicts make it very clear that this was not a case in which the jury blindly followed the complaining witness's testimony. The jury discerned what it believed from Doe's story and what it believed from Marcum's story, which resulted in six not guilty verdicts and three guilty verdicts. The fact that the three guilty verdicts all centered around counts from the indictment that required Doe's being substantially impaired was understandable, given that Marcum himself provided sufficient testimony to establish that Doe was substantially impaired as a result of methamphetamine that Marcum had administered to Doe. Upon the record before us, we cannot conclude that, but for the error of allowing Pyles's testimony about Doe's veracity and the State's later

reference to this testimony, the outcome of the trial clearly would have been different.

{¶ 45} Marcum's second assignment of error is overruled.

III.     Marcum Has Not Shown That There Is A Reasonable Probability That The Outcome of The Trial Would Have Been Different

{¶ 46} Marcum's first assignment of error states:

MARCUM WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO OBJECT TO IMPROPER TESTIMONY AND THE IMPROPER EMPHASIS OF THAT TESTIMONY BY THE STATE IN CLOSING ARGUMENT.

{¶ 47} To prevail on his ineffective assistance of counsel claim, Marcum must prove that his attorney was ineffective under the standard test from *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To do so, he must prove that his counsel's performance was deficient and that he was prejudiced by that performance. *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, ¶ 10. "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Id.* The failure to meet either prong is fatal to an ineffective assistance of counsel claim. *Strickland* at 697.

{¶ 48} Marcum contends that "[t]he testimony in this case indicates that Jane Doe was not credible, but the State relied upon her credibility to convict Marcum. * * * The

State needed something more, and witness Lucas Pyles gave it to them." Brief of Appellant, p. 11. According to Marcum, the failure of his counsel to object to this testimony and the State's emphasis of it in the closing argument was prejudicial to Marcum, and there is a reasonable probability that the result of Marcum's trial would have been different but for his trial counsel's failures. *Id.*

{¶ 49} We agree with Marcum that Pyles's testimony regarding the apparent veracity of Doe's claims of rape should have been objected to by Marcum's counsel and excluded from evidence by the trial court. Further, the State should not have been allowed to reference this testimony as part of its closing argument. Therefore, Marcum has demonstrated that his counsel's performance fell below an objective standard of reasonableness.

{¶ 50} But as explained above in our resolution of Marcum's second assignment of error, Marcum did not suffer prejudice as a result of this mistake. Based on its six not guilty verdicts, it is clear that the jury did not blindly accept Doe's version of events. Rather, it appears that the jury found Marcum's testimony more believable than Doe's on the six counts in the indictment that did not involve a substantially impaired victim, or at least found reasonable doubt as to whether Marcum committed the crimes set forth in those six counts. Ultimately, the jury did find that Marcum had sexual conduct and/or contact with someone who was substantially impaired to the point of not being able to consent. It also found that, not only was he aware of Doe's substantial impairment (rape counts), he played an active role in her substantial impairment (gross sexual imposition count). As explained above, the overwhelming evidence of record supported these three

convictions.

{¶ 51} On this record, we cannot conclude that there exists a reasonable probability that, but for counsel's error, the result of the trial would have been different. The first assignment of error is overruled.

IV.     Conclusion

{¶ 52} Both of Marcum's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J., concurs.

DONOVAN, J., concurring:

{¶ 53} I write separately to express my concern over the prosecuting attorney's misconduct by emphasizing, in her final closing argument, the inadmissible opinion testimony of firefighter-paramedic Pyles that Doe "appeared very believable and that this was a true rape case."   By reasserting Pyles's opinion of Does's veracity, the State gave an imprimatur to Pyles's opinion which invaded the province of the jury to resolve all factual determinations regarding credibility. "A prosecutor may strike hard blows, but he [or she] may not strike foul ones." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 78 L.Ed. 1314 (1935). Foul blows include "relying on improper evidence." *State v. Robinson,* 8th Dist. Cuyahoga No. 110467, 2022-Ohio-1311, ¶ 46, quoting *State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2011-Ohio-2656, ¶ 7.   I recognize that Pyles's

testimony was seemingly inadvertent and non-responsive to the prosecutor's direct questioning, but this argument by the prosecutor was intentional and improper.

**{¶ 54}** Furthermore, unlike the majority, I would place firefighter-paramedic Pyles in the same category as the police officer in *Richcreek.* Both are first responders, both trained to deal with alleged victims of violent crimes. In fact, Pyles referenced his time in "fire service." Hence his testimony was every bit as prejudicial as that of an expert or police officer.

**{¶ 55}** Lastly, this is a close case in my mind. Marcum must establish that "but for the error, the outcome of the trial clearly would have been different." *Kinsworthy,* 12th Dist. Warren No. CA2013-06-053, 2014-Ohio-1584, ¶ 16. On this issue, given the totality of facts, the majority is correct that Marcum cannot meet this burden. This case is unique in that there was compelling video evidence of Pyles's initial encounter with Doe. Furthermore and most importantly, as noted by the majority, Marcum's own testimony established Doe's substantial impairment and Marcum's knowledge that her ability to resist or consent was substantially impaired because of her physical condition, namely the ingestion of significant quantities of potent drugs. For the aforementioned reasons, I concur in the affirmance, but caution the prosecutor that, under different facts, a new trial would be warranted.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis

Robert Alan Brenner
Hon. Mary E. Montgomery