[Cite as *State v. Greywolf*, 2026-Ohio-887.]

COURT OF APPEALS
KNOX COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | Case No. 25CA000004 |
| Plaintiff - Appellee | <u>Opinion and Judgment Entry</u> |
| -vs- | Appeal from the Knox County Court of Common Pleas, Case No. 23CR07-0154 |
| MICHAEL GREYWOLF | Judgment: Affirmed |
| Defendant - Appellant | Date of Judgment Entry: March 16, 2026 |

**BEFORE:** Andrew J. King, William B. Hoffman, Kevin W. Popham, Appellate Judges

**APPEARANCES:** Charles T. McConville, Knox County Prosecutor, Christine C. Wiliams, Assistant Prosecuting Attorney, for Plaintiff-Appellee; Todd W. Barstow, for Defendant-Appellant

OPINION

*Hoffman, J.*

**{¶1}** Defendant-appellant Michael S. Greywolf appeals his convictions and sentence entered by the Knox County Court of Common Pleas, on two counts of rape, following a jury trial. Plaintiff-appellee is the State of Ohio. We affirm Appellant's convictions and sentence.

STATEMENT OF THE CASE AND FACTS

**{¶2}** On July 3, 2023, the Knox County Grand Jury indicted Appellant on three counts of rape. Appellant appeared before the trial court for arraignment on July 7, 2023, and entered a plea of not guilty to the charges. The original indictment was amended several times during the pendency of the matter. The final amended indictment charged Appellant with one count of rape, in violation of R.C. 2907.02(A)(2), a felony of the first degree; and one count of rape, in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree. Both counts included a sexually violent predator specification pursuant to R.C. 2941.148. The State also moved to dismiss Count 3 and the attendant sexually violent predator specification.

**{¶3}** The trial court conducted a hearing to determine Victim's competency to testify at trial. Via Decision and Entry filed August 28, 2024, the trial court found Victim competent to testify.

**{¶4}** Prior to the commencement of trial, Appellant waived his right to jury trial on the sexually violent predator specifications. The matter proceeded to jury trial on April 8, 2025. The following evidence was adduced at trial.

**{¶5}** On May 24, 2023, Knox County Children's Services ("KCCS") received a report of alleged neglect of Victim and U.C., her younger brother, due to concerns Appellant, who was a registered sex offender, was caring for the children when Leanna Davis, the children's mother, and Jamie Compton, her fiancé, were working. The following day, KCCS received a call from a local elementary school advising U.C. had made disclosures relative to Victim being sexually abused by Appellant. Danielle Crider, an administrator at KCCS, learned U.C. was exhibiting aggressive behavior in the classroom, was having trouble focusing, and reported he was worried about Victim. U.C. also stated Davis had put him in charge of protecting Victim when Appellant and his girlfriend Mary Jane Hogle, Compton's mother, were watching them.

**{¶6}** Crider met with the family to discuss concerns related to Appellant being an inappropriate caregiver as well as Appellant's sexual abuse of Victim. When Crider spoke with Davis about the sexual abuse allegations, Davis immediately became upset and angry. Crider then spoke with U.C. who repeated what he had revealed to school staff. Victim was initially reluctant to speak with Crider, but eventually disclosed the abuse. Per protocol, an interview was scheduled at the Child Advocacy Center at Nationwide Children's Hospital ("CAC"). Crider turned everything over to the Knox County Sheriff's Office for investigation.

**{¶7}** Detective Matthew White with the Knox County Sheriff's Office, whose focus is child sex crimes and crimes against the elderly, attends daily intake meetings with KCCS. During an intake meeting in late May, 2023, Detective White learned of the allegations against Appellant. Detective White spoke with Davis to arrange to have Victim

interviewed at CAC.  After watching the CAC interview, Detective White placed Appellant under arrest.

{¶8}    Detective White interviewed Victim who described a number of incidents of sexual abuse Appellant perpetrated on her. One incident occurred while she was in her room, listening to loud music and watching television. Appellant came into her room and touched her breasts over the top of her clothing then under her clothing.  Victim recounted Appellant touching her vagina and her "butt." Victim stated Appellant pulled down her pants and touched her vagina with his penis, his mouth, and his hands. Victim recalled another incident which occurred while she was in her room, crying and listening to sad music.  Appellant entered her room and Victim told him to leave. Appellant moved on top of Victim and removed her clothing. Because Victim was on her period, Appellant used his penis to sodomize her. Following this incident, Victim disclosed the abuse to U.C.

{¶9}    Detective White obtained a search warrant for communications between Victim and Davis. On April 21, 2023, Victim messaged Davis: "he started touching me Wednesday night and yesterday night and he started doing it today as well, but I told him, no, but he excuses me to let him do it, but I didn't let him at all that's why we have been taking longer bike rides is because he's been touching me." Trial Transcript, Vol. I, p. 157. Later that evening, Victim messaged Davis, asking "what should I do about my pain, it hurts really bad, it hurts me really bad." *Id*. at p. 158.  Detective White confirmed Victim was 15 years old at the time of these incidents.

{¶10}  During the CAC interview, Victim also disclosed incidents of sexual abuse which occurred when Appellant took her on motorcycle rides.  Victim described additional incidents of sexual abuse which occurred at a storage unit. The abuse played out in the

same manner, Appellant would pull down Victim's pants and touch her breasts and vagina with his mouth and penis. Victim was 12 years old at the time of these incidents.

{¶11} Detective White subsequently interviewed Appellant. Appellant described himself as a grandfather figure and indicated he basically did everything for Davis, Compton, Victim, and U.C. Appellant admitted taking Victim and U.C. on motorcycle rides, adding the rides occurred often, but abruptly stopped at one point. Appellant stated he did not know why the rides stopped. Detective White asked Appellant about his tattoos. Appellant described each of his tattoos and the body areas where they were located. Detective White noted Victim was able to describe some of Appellant's tattoos, including one located on his penis. Detective White photographed the tattoo on Appellant's penis.

{¶12} Detective White obtained a search warrant for Appellant's phones. The computer crimes unit conducted a forensic analysis of Appellant's cellphone data, which revealed searches for pornography videos using specific search terms consistent with Victim as a victim. The pornography videos included titles such as "mom lets dad take daughter's virginity;" "stepdad can't resist his long leg teen stepdaughter;" and "stepdaddy/daughter favorites list."

{¶13} Detective White listened to Appellant's jail phone calls. Detective White noted there is an admonition to each call, warning the callers and listeners the jail phone calls are recorded and may be monitored. Appellant made frequent phone calls to Hogle, his son, and Hogle's daughter. During a call with Hogle, Appellant instructed Hogle to ask her grandson, Tyler Grubaugh, to speak with Victim in order to change her mind about pursuing the criminal charges. Detective White examined Appellant's criminal history and

found he had been convicted of rape of a 13-year-old girl in Tennessee on June 7, 1988; and rape of a 14-year-old girl in Knox County, Ohio, in 2001.

**{¶14}** Rachel Torrance, a behavioral therapist and licensed special education teacher with extensive experience in dealing with children with autism, conducted an interview of Victim, who had previously been diagnosed with autism. Torrance observed Victim in a classroom setting and conducted a structured interview of Victim at CAC. Torrance prepared a report for the trial court. Victim was 15 years old at the time of the interview.

**{¶15}** Torrance reviewed the State's file and learned, in 2014, KCCS removed Victim and U.C. from Davis and Compton's home.  Victim and U.C. were placed with Hogle, who lived with Appellant. Victim and U.C. were returned to Davis and Compton's home, but remained close with Hogle and Appellant. In May, 2023, U.C. began acting out in school. As a result of U.C.'s disclosures, school personnel contacted KCCS.

**{¶16}**  In her report, Torrance noted Victim was able to engage with others, answer questions, recall past events, and demonstrate "the competency to stand on trial to answer questions related to her events." Tr., Vol. II, p. 235. Torrance indicated Victim is not nonverbal and uses language to communicate although she tends to use phrases rather than complete sentences. Victim is on an academic curriculum path although the content of some of her class subjects is a year below her grade level.  Torrance described Victim as "very much" a functioning high schooler. *Id.* at p. 237.

**{¶17}**  Torrance observed Victim's interview with the forensic interviewer at CAC. Based upon her observations, Torrance found:

She has vocal language, but sometimes provides limited details. There were times during that interview where she needed to be prompted or probed, for instance, and sometimes she would answer questions related to the question, but not exactly answering the questions, and so then the interviewer would say like tell me more about it and the [the Victim] was able to provide more details. Um, she also did engage in what presented as scripting where she would kind of just go into this longer response, um, that didn't flow the way a neurotypical child would, but she's still sharing information, she's still communicating, um, and I was able to identify what she was saying. Um, she also can retell events, she definitely had more of a flat affect and it's important to share she has language, but her language might present differently than if she didn't have autism.

*Id*. at pp. 245-246.

{¶18} Torrance noted Victim did not provide details without being prompted and did not use facial expressions as a nonverbal means of communicating, however, despite her flat affect, Victim was able to express how she felt and the fact she did not like what was happening. Victim advised Torrance the abuse Appellant inflicted upon her happened for many years, beginning when she was 6 years old. When asked if there was anything about Victim's autism which would prevent her from disclosing the abuse, Torrance responded:

I'm understanding that [Davis] relied on [Appellant] to take her to work and to get groceries. [Victim is] higher functioning enough to understand those basic fundamental needs are needed and they (Victim's family) couldn't get food and access work in order to get food and be able to do all those things in life without [Appellant], so there was almost like, I'm going to call it interdependency that was very likely. The family was absolutely dependent on [Appellant] and [Victim] would have understood that and also been naïve enough to be, um, taken advantage of given that situation.

*Id*. at pp. 253-254.

**{¶19}** Alison Humphreys, a medical forensic interviewer and a mental health advocate at CAC, conducted an interview with Victim on June 12, 2023. Humphreys was aware of Victim's autism prior to the interview. During her assessment, Humphreys found Victim presented younger than her chronological age and found her a bit immature. Humphreys noted Victim was able to provide facts regarding the most recent incident of abuse by Appellant as well as additional incidents of abuse. Although Victim was immature, Humphreys found she described the incidents of Appellant's abuse in great detail.

**{¶20}** Victim, who was 17 years old at the time of trial, testified, when she was 6 years old, she lived with Hogle and Appellant. When asked about her relationship with Appellant, Victim stated, "[h]e was my grandpa" and she "loved him at one point." *Id*. at p. 297. Victim recalled, in May, 2023, her brother told his middle school teacher Victim

had been raped.  As a result, KCCS opened an investigation.  Victim testified she told Danielle Crider, the KCCS worker, Appellant had raped her. Victim was 15 years old at the time of the disclosure.

{¶21} Victim detailed a number of incidents during which Appellant touched her breasts and her "butt," and placed his fingers into her vagina. She denied ever giving Appellant permission to touch her. After an incident during which Appellant sodomized her, Victim sent a message to Davis. Victim told Davis she had been feeling pain all day. Later that day, U.C. messaged Davis and told her Appellant had been touching Victim. Approximately one month later, Appellant vaginally raped Victim. Victim stated Appellant would take her on motorcycle rides. Initially, Victim enjoyed the rides until Appellant began taking her on longer rides during which he would stop and rape her. Victim indicated Appellant raped her "[a] lot of times" when she went on motorcycle rides with him. Appellant also raped Victim at a storage shed. Victim testified she did not tell anyone because Appellant helped her family and he told her if she told anyone, she would end up in foster care and never see her parents again.

{¶22} U.C., Victim's younger brother, testified Appellant provided transportation to the family, including driving Davis to work.  U.C. explained neither Davis nor Compton had a driver's license.  U.C. acknowledged there was a time he enjoyed being around Appellant. Appellant would take U.C. and Victim on motorcycle rides, however, there came a point when he became angry about the rides because he noticed his rides were significantly shorter than Victim's rides.  U.C. thought something inappropriate was happening, explaining Victim "had been raped before and it was basically just showing

the same like signals, but in different ways." Tr. at p. 362.  U.C. also stated Victim began "acting weird" and "acting closed up." *Id*.

**{¶23}** U.C. recalled times when Appellant would drive the family to the grocery store. U.C. would accompany Davis into the store while Victim remained in the car with Appellant.  Victim eventually told U.C. Appellant was inappropriately touching her during these times.  U.C. sent a message to Davis telling her what Victim had revealed. Neither Davis nor Compton took any action, but told U.C. to keep an eye on Victim.  U.C. became frustrated.   In May, 2023, U.C. was acting out at school and was sent to the principal's office. U.C. told the principal what was happening to Victim. The principal called KCCS. A social worker visited the Victim and her family that evening.

**{¶24}** Leanna Davis, Victim's mother, acknowledged she and Jamie Compton were heavy meth users, and, as a consequence, KCCS removed Victim and U.C. from the home. Hogle was granted custody of Victim and U.C. when Victim was approximately six years old and U.C. was either one or two years old.  After four or five months, Victim and U.C. were returned to Davis' home. Hogle and Appellant often visited to spend time with the children. Davis stated Hogle occasionally babysat the children, but if she was unavailable Appellant would watch them.

**{¶25}** Davis recognized she and her family were dependent upon Appellant for transportation and food, adding Appellant also checked on the family's general well-being. Davis stated Appellant was a father figure to her and a grandfather to Victim and U.C., adding he was an important part of their lives.  Davis admitted she was aware Appellant was a registered sex offender, but "thought he changed." *Id*. at p. 395.

**{¶26}** Davis did not know Appellant was sexually abusing Victim until April, 2023, when she received a message from U.C. on the evening of April 13, 2023, in which U.C. stated Victim told him Appellant had been touching her. Davis acknowledged she did not respond with the appropriate urgency because she was busy at work. Later that evening, Victim left Davis a voicemail message disclosing the abuse. Although Appellant was scheduled to drive Davis home from work, she told him not to do so and instructed him to stay away from her home. Davis did not confront Appellant about what Victim and U.C. revealed nor did she contact the police because she "didn't want to believe it" and "didn't think he would do that to [her] child." *Id*. at p. 401. Davis revealed she also did not contact the police because she was afraid she would "get in more trouble that [sic] [she] already. . . was in." *Id*. at p. 403.

**{¶27}** Davis admitted Appellant saw Victim and U.C. following Victim's disclosure. Davis instructed U.C. to try to catch Appellant "in the act" and if anything happened "to smack [Appellant] with a baseball bat." *Id*. at p. 405. Davis again conceded neither she nor Compton ever contacted the police. KCCS visited the home in May, 2023, after U.C.'s disclosure to his school principal. Davis was angry because she was afraid KCCS would remove the children. Davis was also angry the police wanted her to take Victim to CAC. Davis acknowledged her behavior was selfish and not the way a mother should have responded.

**{¶28}** Mary Jane Hogle testified Appellant told her he was a registered sex offender and she believed he had told her the truth, but subsequently learned he had not been truthful about the ages of his victims. Hogle stated she did not have a problem living with a registered sex offender and having him around her grandchildren, explaining she

let Compton and Davis meet Appellant and make their own decision. Hogle denied she and Appellant were living together while she had custody of Victim and U.C. Hogle maintained Appellant was never alone with the children. Hogle stated she did not have reservations about having a sex offender around her grandchildren because she "thought the kids being [sic] okay and I felt in my heart I could trust him." *Id.* at 427.

{¶29} Hogle rented a storage shed between December, 2019, and June 30, 2022. Hogle could not recall whether Appellant stored any belongings in the shed and had no knowledge of whether he visited the shed without her, claiming they always went together. Hogle did not allow Appellant to take the children for rides on his motorcycle when they were with her. When she and Appellant lived together, they were in an intimate relationship. Hogle testified Appellant had a tattoo on his penis and identified pictures of Appellant's penis and tattoo.

{¶30} Hogle could not remember if Davis told her about Victim's rape allegations in April, 2023, insisting she only learned Appellant raped Victim after he was arrested. The prosecutor played a jail call between Hogle and Appellant from September, 2023. During the call, Appellant instructed Hogle to have her grandson, Taylor Grubaugh, contact Victim to advise her she would be going through "a lot of shit if she testifies." *Id.* at p. 436. Hogle spoke to Grubaugh two days later and told him what Appellant said, but Grubaugh refused to speak with Victim.

{¶31} James "Jamie" Compton testified he and Leanna Davis have been together for 12 to 15 years, and there was a period in his life when they were using drugs. While he and Davis were getting clean, Victim and U.C. lived with Hogle. Compton was aware Appellant was living with Hogle at the time. Although Compton had heard through the

grapevine Appellant was a registered sex offender and had been convicted of rape, he did not have any concerns about Victim and U.C. being in Appellant's care because Appellant "was supposed to be like a grandpa to our kids, so I didn't really think anything of it." Tr., Vol. III, p. 461. Compton acknowledged Appellant did a lot for his family and they were very dependent on him. Compton could not recall U.C. telling him Appellant was touching Victim. Compton admitted he was not focused on Victim and U.C. at the time Appellant was raping Victim because of his drug use.

{¶32} Tyler Grubaugh, Hogle's grandson and Compton's nephew, was aware Appellant was a registered sex offender although he did not learn this information from Hogle. Grubaugh commented no one in his family seemed concerned about Appellant's status and admitted his family, as a whole, was "quite dysfunctional" and there was a lot of drug use. *Id*. at p. 476.

{¶33} Grubaugh recalled returning home from work after a 12-hour shift when Detective White and his probation officers arrived at this residence. Detective White advised Grubaugh about a jail phone call between Hogle and Appellant during which Appellant instructed Hogle to have Grubaugh talk to Victim to try to change her mind. Grubaugh became "really upset" and "really mad," explaining "I want no part of it, I just want to live my life and do what I do, and I didn't want to get in trouble for somebody else." *Id*. at p. 478. Grubaugh confronted Hogle, who informed him she never planned to tell him. Grubaugh stated he would not have talked to Victim to have her change her story.

{¶34} Appellant testified on his own behalf. He detailed his military service and his current health conditions. Appellant stated he has a tattoo of a coyote on his penis and had done it himself. When people ask him how many tattoos he has, Appellant points

between his legs as he counts the tattoos. Although Appellant will tell someone about the tattoo on his penis, he insisted he "won't pull it out and show" it. *Id*. at p. 498. Appellant denied ever inappropriately touching Victim.

{¶35} On cross-examination, Appellant admitted he pled guilty and was convicted of raping a 13-year-old girl in Tennessee in 1988. Appellant also acknowledged, in 2001, he was convicted by a jury of raping a 14-year-old girl. Appellant denied taking Victim alone to Hogle's storage shed. When asked why Victim would know he had a tattoo on his penis, Appellant responded a lot of people in Mt. Vernon and Knox County knew, and Victim's mother knew. Appellant insisted he never told Hogle to ask Grubaugh to tell Victim to change her story. Appellant denied searching rape of young girls on the internet, explaining the searches came up when he was searching adult pornography.

{¶36} After hearing all the evidence and deliberating, the jury found Appellant guilty of both counts of rape. The trial court conducted a bench trial on the specifications and found Appellant was a sexually violent predator. The trial court deferred sentencing pending a presentence investigation. Appellant appeared before the trial court for sentencing on May 8, 2025. The trial court imposed a mandatory indefinite term of imprisonment of a minimum term of 20 years to a maximum term of life on Count 1, and a mandatory indefinite term of imprisonment of a minimum term of 25 years to a maximum term of life on Count 2. The trial court ordered the sentences be served consecutively for an aggregate minimum term of imprisonment of 45 years to a maximum term of imprisonment of life. The trial court adjudicated Appellant a Tier III sex offender/child victim offender.

**{¶37}** It is from his convictions and sentence Appellant appeals, raising the following assignments of error:

I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF RAPE AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. (T. 142-203; 288-334; 497-514; JUDGMENT ENTRY, 5/8/25).

II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY PERMITTING EXPERT TESTIMONY THAT VOUCHED FOR THE VERACITY OF DD'S STATEMENTS. (R. EXHS. 25, 26; T. 225-256; 338-350).

I

**{¶38}** In his first assignment of error, Appellant challenges his convictions as based upon insufficient evidence and as against the manifest weight of the evidence.

**{¶39}** The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, paragraph two of the syllabus (1997). Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law,

while weight of the evidence addresses the evidence's effect of inducing belief. *Id*. at 386-387. A finding a conviction is supported by the manifest weight of the evidence, however, necessarily includes a finding the conviction is supported by sufficient evidence and will therefore be dispositive of the issues of sufficiency of the evidence. *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.).

{¶40} An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).

{¶41} The term "manifest weight of the evidence" relates to persuasion. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. It concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102 n.4 (1997); *State v. Martin*, 2022-Ohio-4175, ¶ 26.

{¶42} In determining whether a judgment is against the manifest weight of the evidence, an appellate court reviews the entire record, "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Sitting as the "thirteenth juror," the court of appeals considers whether the

evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion. *Id*.

**{¶43}** When conducting a manifest weight review, the question is whether the jury clearly lost its way in resolving conflicts, resulting in a manifest miscarriage of justice, even if the evidence is legally sufficient. *Thompkins*, 78 Ohio St.3d at 387; *State v. Issa*, 93 Ohio St.3d 49, 67 (2001). Appellate courts have traditionally presumed the jury's assessment is correct, given its ability to observe witnesses' demeanor, gestures, and tone, all critical factors in evaluating credibility. *Eastley*, 2012-Ohio-2179, at ¶ 21; *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

**{¶44}** A manifest-weight claim succeeds only in "the exceptional case in which the evidence weighs heavily against the conviction." (Internal quotations omitted.) *Thompkins*, 78 Ohio St.3d at 387. To reverse a conviction on manifest-weight grounds, all three judges on the appellate panel must concur. Ohio Const., Art. IV, § 3(B)(3); *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶¶ 2-4, citing *Thompkins*, syllabus ¶ 4.

**{¶45}** Appellant was convicted of two counts of rape, in violation of R.C. 2907.02(A)(1)(b) and (2), which provides:

> (1) No person shall engage in sexual conduct with another when any of the following applies:
>
> * * *
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
>
> * * *

(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

**{¶46}** Appellant asserts, "the State's case rested almost completely on [Victim's] accusations." Brief of Appellant at p. 2.  In support of this assertion, Appellant notes the State failed to present any physical evidence to substantiate Victim's claim Appellant had raped her from the time she was six years old until she was fifteen years old. Appellant continues, although Detective White testified he believed Victim had undergone an examination by a SANE (Sexual Assault Nurse Examiner) nurse and Alison Humphreys testified medical examinations are part of the protocol at CAC, neither a medical doctor nor a SANE nurse testified and Victim's medical records were not offered into evidence. Appellant adds, despite Victim testifying Appellant had taken pictures of her during the rapes, no such pictures were discovered during the search of his cellphone.  Appellant concludes Victim's "testimony should be given little weight." *Id*.

**{¶47}** As set forth in our Statement of the Case and Facts, Victim provided a detailed account of numerous incidents of the sexual abuse she suffered at Appellant's hands.  Victim specified the locations and time frames in which the abuse occurred. She also gave consistent, detailed accounts of the same to KCCS worker Danielle Crider, CAC medical forensic interviewer and mental health advocate Alison Humphreys, and Detective White. Victim disclosed the abuse to her brother, U.C., following one particularly heinous incident. U.C. testified regarding Victim's disclosure and his ongoing suspicions about the longer motorcycle rides Victim took with Appellant.

**{¶48}** The jury was free to accept or reject any or all of the evidence offered by the parties and assess the witnesses' credibility. Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. McGregor*, 2016-Ohio-3082, ¶ 10 (5th Dist.). "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." (Citations omitted.) *Id*. The jury clearly believed the testimony of Victim, over Appellant's testimony.

**{¶49}** Finally, that there was no medical evidence corroborating Victim's allegations does not weigh against Appellant's convictions. "[P]hysical evidence is not required to support a rape conviction against a manifest weight challenge." *State v. Thomas*, 2015-Ohio-5247, ¶ 31 (9th Dist.), citing *State v. Martinez*, 2008-Ohio-4845, ¶ 13 (9th Dist.) (rejecting manifest weight challenge to rape conviction even though there was "'little to no credible physical evidence'"). Furthermore, given the passage of time between the sexual abuse and Victim's disclosure, there was a likelihood neither DNA nor medical evidence would be discovered.

**{¶50}** Based upon the foregoing, we find Appellant's convictions were not based upon insufficient evidence and were not against the manifest weight of the evidence.

**{¶51}** Appellant's first assignment of error is overruled.

II

**{¶52}** In his second assignment of error, Appellant argues the trial court erred by permitting expert testimony which vouched for the veracity of Victim's statements. Specifically, Appellant takes issue with the closing remarks of Rachel Torrance, a

behavioral therapist working and advocating for people with developmental disabilities, including autism, who conducted an interview of Victim.

**{¶53}** At the end of her direct examination, the prosecutor asked Torrance if there was anything she had not been asked, but would like to add.  Torrance responded:

> Um, I'd like to just add in that nowhere in her files did the school or any other records indicate that she has engaged in lying, she's never like, sometimes there's interfering behaviors that neurotypical children engage in or people with autism do, and nowhere in her profile was it she's had disciplinary issues, she's had, she has not had disciplinary issues, she is not engaged in lying, there's never been ongoing barriers to learning her social with lying or things like that too, I mean this is a truth kiddo who wants to, sorry, a truth student who absolutely wants to please and engage and tries really hard and has some really good skills, I think it's important to share that.
>
> Tr., Vol. II, p. 255.

**{¶54}** The State called Torrance as a rebuttal witness. During her testimony, Torrance stated Victim had no motive to lie.  *Id*. at p. 343.

**{¶55}** Appellant did not object to Torrance's testimony; therefore, he has waived all but plain error.  Under Crim.R. 52(B), appellate courts have discretion to correct "[p]lain errors or defects affecting substantial rights notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court." *State v. Rogers*,

2015-Ohio-2459, ¶ 22. To prevail under a plain-error analysis, the appellant bears the burden of demonstrating the trial court "deviated from a legal rule," or there was "an 'obvious' defect in the proceedings" which resulted in prejudice, i.e., the outcome of the proceedings would have been different. *Id*. at ¶¶ 17-22. Courts must notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. at ¶ 23. Courts must assess plain error from the whole of the trial to ascertain if the outcome was affected. *State v. Marcum*, 2022-Ohio-3576, ¶ 38 (2nd Dist.), appeal not allowed, 2023-Ohio-1830.

**{¶56}** Given the overwhelming evidence of Appellant's guilt, we find the outcome of the trial would not have been different but for Torrance's statements vouching for Victim's truthfulness.

**{¶57}** Appellant also points to Torrance's response to defense counsel's question of whether Victim had motive to fabricate a story to get in her mother's good graces. Torrance countered, "I do not feel she would do that or is capable of that because she does not have a history of lying behaviors and her story has been consistent, although some of her responses are a little bit different then if she didn't have autism, but they're still consistent, and I don't see that as the motivation." Tr., Vol. II, p. 349.

**{¶58}** This testimony was elicited by defense counsel during rebuttal cross-examination. The doctrine of invited error provides "a party is not permitted to take advantage of an error that he himself invited or induced the court to make." *State v. Sklenka*, 2015-Ohio-5104, ¶ 12 (5th Dist.). Assuming, arguendo, Torrance's statements on rebuttal cross-examination constituted improper vouching for Victim's veracity, having

specifically questioned Torrance about Victim's motivation to lie, Appellant invited any error in this regard.

{¶59} Appellant's second assignment of error is overruled.

{¶60} The judgment of the Knox County Court of Common Pleas is affirmed. Costs assessed to Appellant.

By: Hoffman, J.

King, P.J. and

Popham, J. concur